IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| JOHN POYNER,<br><br>   Plaintiff,<br><br>  v.<br><br>CARINGHOUSE PROJECTS, INC., *et al.*,<br><br>   Defendants. | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br>No. 1:24-cv-11066-KMW-SAK<br><br>**OPINION** |

**Leo B. Dubler, Esq.**
20000 Horizon Way, Suite 300
Mount Laurel, NJ 08054

*Counsel for Plaintiff John Poyner*

**Joseph C. DeBlasio, Esq.**
JACKSON LEWIS P.C.
200 Connell Drive, Suite 2000
Berkeley Heights, NJ 07922

*Counsel for Defendants CaringHouse Projects, Inc.; Caring Inc.; and Heather Furca*

**WILLIAMS, District Judge:**

## I. INTRODUCTION

Plaintiff John Poyner ("Plaintiff") brings this employment action against CaringHouse Projects, Inc. ("CaringHouse") and director Heather Furca (together, "Defendants"), alleging violations of the New Jersey Law Against Discrimination ("NJLAD"), N.J. STAT. ANN. §§ 10:5-1 *et seq.*[1] In initiating this action, Plaintiff elected to plead their claims exclusively under state law, and thus filed a complaint in the Superior Court of New Jersey, Law Division, Atlantic County. Defendants have since removed Plaintiff's case to this Court on the basis of federal-question

---

[1] Plaintiff also names Caring Inc. as a defendant, alleging that it is the owner of CaringHouse Projects, Inc. *See* Compl. ¶ 4. For purposes of this Opinion, the Court refers to both defendants as "CaringHouse."

jurisdiction, asserting that one or more of Plaintiff's claims are completely preempted by federal labor law.

Presently before the Court is Plaintiff's motion to remand this matter to state court, which Defendants have opposed. For the reasons set forth below, Plaintiff's motion is granted.

## II. BACKGROUND

Plaintiff was employed by CaringHouse as a personal assistant from May 2023 to June 2024. *See* Compl. ¶¶ 1, 65. Plaintiff is openly gay and nonbinary. *See id.* ¶ 94. In their Complaint, Plaintiff alleges that they were subjected to humiliation and harassment by supervisors and coworkers during the course of their employment. *See id.* ¶¶ 5–11. For example, one coworker is alleged to have repeatedly made crude comments and gestures directed toward Plaintiff, and on one occasion grabbed Plaintiff's genitalia in a breakroom in front of other employees. *See id.* ¶¶ 6, 10, 22. Defendant Furca is alleged to have both witnessed and participated in this conduct. *See id.* ¶¶ 7, 11. Plaintiff alleges that they repeatedly complained about this mistreatment to Furca and human resources, but that those complaints were ignored. *See id.* ¶¶ 8, 12, 25–27. Ultimately, Plaintiff raised their complaints at an April 16, 2024 union meeting, at which Furca was present. *See id.* ¶ 41.

In the wake of that meeting, Plaintiff alleges that they faced escalating mistreatment from coworkers and supervisors. For example, on April 29, 2024, Plaintiff received a three-day suspension for being disorderly and inappropriate. *See id.* ¶¶ 43, 84. However, Plaintiff explains that they had a clean disciplinary record, and that they had walked away from a coworker who was yelling at and becoming aggressive with them. *See id.* ¶ 43. Though that suspension was later reduced to one day, Plaintiff expressed to Furca, human resources, and their union representative

that they were being targeted for having publicly complained at the meeting. *See id.* ¶¶ 44–46. Those concerns were allegedly disregarded. *See id.*

Beyond this suspension, Plaintiff also alleges a broader pattern of hostility and antagonism. For example, one supervisor allegedly expressed to Plaintiff her personal dislike for "gays" due to the AIDS epidemic, while also stating, "Even though you identify as non-binary, I am going to call you a man, because that is what you are." *Id.* ¶ 78. Plaintiff also describes having their break time being arbitrarily moved to an inconvenient hour; enduring ongoing mistreatment and derogatory comments from coworkers; and having their complaints regarding this conduct go ignored. *See id.* ¶¶ 61–62, 78–84.

On July 17, 2024, Plaintiff made separate complaints directly to CaringHouse's owner and another director about the ongoing mistreatment. *See id.* ¶¶ 48, 62, 64. That same day, Plaintiff also complained to Furca regarding another employee's hostile behavior. *See id.* ¶ 64. Thereafter, Furca allegedly suspended Plaintiff without reason, and Plaintiff was ultimately terminated eight days later. *See id.* ¶ 65.

On November 13, 2024, Plaintiff initiated the instant action against CaringHouse and Furca in the Superior Court of New Jersey, Law Division, Atlantic County. (ECF No. 1 at 11–26.) In the Complaint, Plaintiff asserts various claims for discrimination, hostile work environment, and retaliation, all of which are pled exclusively under the NJLAD. (*Id.*)

Defendants subsequently removed Plaintiff's case pursuant to 28 U.S.C. § 1441, asserting that this Court has federal-question jurisdiction over the action under 28 U.S.C. § 1331. (*Id.* at 1–8.) More specifically, Defendants predicate their removal on the Labor Management Relations Act ("LMRA"), a federal statute governing disputes over labor contracts between employers and labor unions. *See* 29 U.S.C. §§ 141 *et seq.* Pointing out that Plaintiff is a member of AFL-CIO affiliate

Communications Workers of America, Defendants claim that Plaintiff's state-law claims are "substantially dependent" on an "interpretation" of the collective-bargaining agreement ("CBA") between the union and CaringHouse, and that the LMRA consequently preempts these claims, thereby justifying removal. (ECF No. 1 at 1–8.)

On January 20, 2025, Plaintiff filed the instant motion to remand. (ECF No. 7.) Therein, Plaintiff argues that none of their NJLAD claims are completely preempted by the LMRA, and that the Court should consequently remand this matter to state court for lack of subject-matter jurisdiction. Defendants have opposed Plaintiff's motion. (ECF No. 10.)

### III. LEGAL FRAMEWORK

The removal of this action begins with 28 U.S.C. § 1441, which permits removal of any civil action brought in state court that falls within the "original jurisdiction" of the federal district courts. One species of original jurisdiction is so-called "federal-question jurisdiction," which extends to all civil actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Thus, the question raised by Defendants' removal is whether this action is one "arising under" federal law—an inquiry informed by two distinct but closely related jurisdictional rubrics.

#### A. The Well-Pleaded Complaint Rule

For more than a century, the presence or absence of federal-question jurisdiction has been governed by the "well-pleaded complaint" rule, which provides that "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987); *see also Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152 (1908). This rule embodies the principle that the plaintiff is the "master of the complaint"—if she elects to plead exclusively state-law claims, then she is entitled to have

her claims heard in a state forum. *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025) (citing *Caterpillar*, 482 U.S. at 398–99); *see also Healy v. Sea Gull Specialty Co.*, 237 U.S. 479, 480 (1915) ("[T]he plaintiff is absolute master of what jurisdiction he will appeal to.").

By its operation, the well-pleaded complaint rule "severely limits the number of cases" that defendants may remove to federal district court. *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 9–10 (1983). A defendant cannot remove an action merely because the factual allegations supporting a state-law claim could, in theory, satisfy the elements of an analogous federal claim. *See Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 810 n.6 (1986) ("Jurisdiction may not be sustained on a theory that the plaintiff has not advanced."). Nor can a case be removed "on the basis of a federal defense, including the defense of pre-emption." *Caterpillar*, 482 U.S. at 393. That restriction applies "even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Id.* Thus, "absent diversity jurisdiction," a case is generally not removable "if the complaint does not affirmatively allege a federal claim." *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 6 (2003).

### B. The Complete-Preemption Doctrine

A distinct but closely related corollary to the well-pleaded complaint rule is the "complete-preemption doctrine." As previously indicated, a federal preemption defense cannot ordinarily supply the basis for federal-question jurisdiction, precisely because it does not "appear on the face of the complaint." *Caterpillar*, 482 U.S. at 398. But "complete preemption" is different—it is a jurisdictional doctrine under which a federal statute has been interpreted to carry a preemptive force so "extraordinary" that it will "convert" certain state-law claims into federal claims for purposes of removal. *See Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64 (1987); *see also*

*Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 407 n.8 (3d Cir. 2021) (observing distinction between "ordinary preemption" and "complete preemption").

Complete preemption is a statute-specific doctrine that applies only when Congress has manifested an intent to "provide[] the exclusive cause of action for the claim asserted." *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003). Such a statute "does not merely preempt a state law to some degree; rather, it substitutes a federal cause of action for the state cause of action." 14C WRIGHT & MILLER'S FED. PRAC. & PROC. JURIS. § 3722.2 (Rev. 4th ed. 2025); *see also Vaden v. Discover Bank*, 556 U.S. 49, 61 (2009) (describing how completely preempted state-law claims are "recast" or "recharacterized"). Thus, when a plaintiff pleads a state-law claim that is completely preempted, it "is considered, from its inception, a federal claim," consequently supplying the basis for federal-question jurisdiction and, by extension, removal. *Caterpillar*, 482 U.S. at 393; *see also Vaden*, 556 U.S. at 61. In this sense, "[t]he complete-preemption doctrine provides that a federal question *does* appear on the face of the complaint," converting a state-law action into one "arising under" federal law for purposes of removal. *Maglioli*, 16 F.4th at 407 (emphasis in original).

One of the few statutory sources recognized to carry such an extraordinary preemptive force is § 301 of the LMRA, which confers federal jurisdiction over disputes concerning collective-bargaining agreements. Section 301 reads as follows:

> Suits for violation of contracts between an employer and a labor organization representing employees . . . may be brought in any district court of the United States having jurisdiction of the parties.

29 U.S.C. § 185(a). Importantly, federal jurisdiction over such disputes is not exclusive. That a case "may" be litigated in federal court does not mean that it must, and state courts are free to hear and resolve labor-contract disputes as well. *See Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 506 (1962) (holding that state courts have concurrent jurisdiction over § 301 claims).

Notwithstanding its apparent jurisdictional focus, § 301 has also been interpreted as authorizing federal courts to develop a body of common law for the interpretation and enforcement of collective-bargaining agreements. *See Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 451 (1957); *see also Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985) ("[*Lincoln Mills*] understood § 301 as a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts."). However, concurrent jurisdiction over such matters risks inconsistency: "individual contract terms might have different meanings under state and federal law," which "would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962). To ensure uniformity, the Supreme Court initially held that § 301 displaced inconsistent state law and required that labor-contract disputes be adjudicated under the developing body of federal common law. *See id.* at 103–04 ("[T]he subject matter of s 301(a) 'is peculiarly one that calls for uniform law.'"). But the need for uniformity has persisted, and over time this displacement principle was refined into what we today recognize as the complete-preemption doctrine. *See, e.g.*, *United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 368 (1990) (discussing interpretive history of § 301); *see also Avco Corp. v. Aero Lodge No. 735*, 390 U.S. 557 (1968); *Allis-Chalmers*, 471 U.S. at 209; *Caterpillar*, 482 U.S. at 393.

The Supreme Court has made clear that § 301 completely preempts not only state-law claims that are "founded directly on rights created by collective-bargaining agreements," but also claims that are "substantially dependent on analysis of a collective-bargaining agreement." *Caterpillar*, 482 U.S. at 394. Stated differently,

> if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are

7

> States) is pre-empted and federal labor-law principles—necessarily uniform throughout the Nation—must be employed to resolve the dispute.

*Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–06 (1988). Significantly, § 301 preemption is not limited to contractual disputes between employers and unions; it may also extend to state-law tort claims asserted by individual employees. *See Allis-Chalmers*, 471 U.S. at 220; *see also Medley v. Atl. Exposition Servs., Inc.*, 550 F. Supp. 3d 170, 191 (D.N.J. 2021).

Although § 301 preemption is potent, it is also narrow. The relevant inquiry is whether "the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement," thereby "requir[ing] a court to interpret" one or more of its terms. *Lingle*, 486 U.S. at 407. At the same time, "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law." *Allis-Chalmers*, 471 U.S. at 211. As the Supreme Court has explained, "when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994). Thus, the mere "reference to" or "consideration of" the terms of a collective-bargaining agreement is insufficient to warrant preemption. *Medley*, 550 F. Supp. 3d at 192 (quoting *LaResca v. AT&T*, 161 F. Supp. 2d 323, 330 (D.N.J. 2001)). And even where a state-law claim might partially depend on the meaning of a collective-bargaining agreement, that does not completely preempt it: "[i]n such a case, federal law would govern the interpretation of the agreement, but the separate state-law analysis would not be thereby pre-empted." *Lingle*, 486 U.S. at 413 n.12; *see also Rutledge v. Int'l Longshoremen's Ass'n AFL-CIO*, 701 F. App'x 156, 161 (3d Cir. 2017).

8

## IV. LEGAL STANDARD

Once a case is removed to federal court, the removing party "carries a heavy burden of showing that at all stages of the litigation the case is properly before the federal court." *Brown v. JEVIC*, 575 F.3d 322, 326 (3d Cir. 2009). "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). In all cases, the removal statute must be "strictly construed," and "all doubts should be resolved in favor of remand." *In re Briscoe*, 448 F.3d 201, 217 (3d Cir. 2006).

Where removal is premised on § 301 of the LMRA, the defendant must show that at least one of the plaintiff's claims is either "founded directly on rights created by collective-bargaining agreements" or "substantially dependent on analysis of a collective-bargaining agreement." *Caterpillar*, 482 U.S. at 394. The relevant inquiry is whether "the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement," thereby "requir[ing] a court to interpret" one or more of its terms. *Lingle*, 486 U.S. at 407. If the claim can be resolved without interpreting a collective-bargaining agreement, then the claim is "independent" of the agreement and consequently not preempted by § 301. *Id.*

## V. DISCUSSION

In ruling on Plaintiff's motion to remand, the Court's task is to determine whether it has federal-question jurisdiction under 28 U.S.C. § 1331. As previously indicated, Defendants contend that jurisdiction lies here by virtue of § 301 of the LMRA, which they argue completely preempts Plaintiff's state-law claims. As the parties invoking federal jurisdiction, Defendants bear the burden of showing that § 301 applies.

### A. **Section 301 Preemption**

In defense of their removal of this action, Defendants articulate two theories of complete preemption, each of which they tie to a discrete allegation in the Complaint. The first concerns the alleged alteration to Plaintiff's break time, while the second pertains to the reduction in Plaintiff's first suspension. According to Defendants, both allegations reveal that some of Plaintiff's claims, notwithstanding their grounding in state law, turn on an "interpretation" of the CBA, rendering them preempted by the LMRA. The Court addresses each of Defendants' theories in turn.

#### 1. *Break-Time Allegation*

Paragraph 62 of the Complaint alleges that Plaintiff complained to upper management that their break time was arbitrarily changed, which is passively characterized as "yet another form of retaliation." Seizing on this incidental remark, Defendants interpret the Complaint as asserting a distinct retaliation claim based on the break time change, which they deem a "core issue" in this litigation. *See* Defs.' Br. at 2, 6. From this reframing, they proceed to argue that this claim is preempted by the LMRA. First, they point to Article 8 of the CBA for the proposition that they had the "right to change or alter work schedules." *Id.* at 10. Second, Defendants submit that— whatever legitimate, nonretaliatory reason they will ultimately proffer for this action in the future —it will necessarily "include the fact" that the change was "consistent with" Article 8. *Id.* at 6. They proceed to reason that to resolve Plaintiff's claim, the Court (or a jury) will be compelled to decide whether the break-time change was either a "proper" exercise of that authority under the CBA, "or instead an unlawful act of retaliation" under the NJLAD. *Id.* at 2. Thus, they conclude that "[n]o finder of fact can assess" its defense without also "interpreting" the CBA. *Id.* at 6. The flaws in this argument are legion.

10

As an initial matter, Defendants appear to target an allegation, rather than a claim capable of preemption. This passing reference to Plaintiff's break-time change appears under Count IV of the Complaint, which asserts a claim for retaliatory discharge. *See* Compl. ¶ 66 (asserting termination violated NJLAD's antiretaliation provision). As far as the Court can discern, this break-time allegation is merely meant to provide factual context to Plaintiff's termination, rather than serve as a separate, independent theory of liability. At best, it is merely one out of many instances of alleged antagonistic conduct that contributed to the broader hostile environment. *See, e.g.*, *Shepherd v. Hunterdon Developmental Ctr.*, 803 A.2d 611, 622 (N.J. 2002) (discussing distinction between a discrete act of retaliation and a series of acts that collectively constitute one unlawful employment practice). But to the extent Plaintiff has indeed intended to assert a distinct retaliation claim based on this one act, the preemption theory Defendants articulate is so logically and legally misconceived that it falls flat at the threshold.

Start with the "dilemma" laced into Defendants' argument. They posit, without any factual or legal support, that a jury will need to determine whether the change to Plaintiff's break time was "proper" under the CBA or "unlawful" under the NJLAD. This assertion is plainly wrong. An employer is not insulated from liability under the NJLAD simply because it exercised a right reserved to it under a collective-bargaining agreement. *See Allis-Chalmers*, 471 U.S. at 212 ("Clearly, § 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law."); *Mitchell v. Vill. Super Mkt., Inc.*, 926 F. Supp. 476, 480 (D.N.J. 1996) ("[T]he NJLAD confers nonnegotiable rights upon the plaintiff which rights exist independent of the collective bargaining agreement and cannot be altered or waived through it."). In other words, neither the source of Defendants' authority nor the propriety of its exercise has any bearing on the elements of a retaliation claim.

11

To maintain a retaliation claim under the NJLAD, Plaintiff must show (1) prior engagement in a statutorily protected activity known to Defendants; (2) a subsequent adverse employment action; and (3) a causal connection between the two. *See Battaglia v. United Parcel Serv., Inc.*, 70 A.3d 602, 619 (N.J. 2013). Of course, Defendants will be required to articulate some legitimate, nonretaliatory reason for the adverse action. *See Allen v. Cape May Cnty.*, 250 A.3d 450, 465 (N.J. 2021). But the question raised by that defense is not whether Defendants were authorized to take a particular action, contractually or otherwise. Rather, it is whether that action was taken with a "retaliatory motive." *Young v. Hobart W. Grp.*, 897 A.2d 1063, 1070 (N.J. Super. Ct. App. Div. 2005); *see also* N.J. CIV. JURY INST. 2.22 (rev. Jan. 2019) (identifying the employer's motive as the "ultimate issue" to be decided in a retaliation case).

Nearly four decades ago in *Lingle*, the Supreme Court held that adjudicating an employer's motive in a state-law retaliation case involves a "purely factual inquiry [that] does not turn on the meaning of any provision of a collective-bargaining agreement." 486 U.S. at 407. Consistent with this precedent, the Third Circuit and this District have repeatedly held that retaliation claims under the NJLAD are not preempted by § 301 of the LMRA. *See, e.g., Rutledge*, 701 F. App'x at 161; *Medley*, 550 F. Supp. 3d at 193; *Mitchell*, 926 F. Supp. at 480; *Naples v. New Jersey Sports & Exposition Auth.*, 102 F. Supp. 2d 550, 553 (D.N.J. 2000). Tellingly, Defendants make no mention of *Lingle*. Nor do they seriously engage with the authorities in this Circuit. Instead, they merely insist that preemption is warranted because "the Court (or one day a jury) would need to interpret the CBA to decided [*sic*] whether Defendants retaliated against Plaintiff." Defs.' Br. at 5. That very argument has long been "foreclosed by *Lingle*." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 266 (1994) (reaffirming that state-law retaliation claims "require only the purely factual inquiry into any retaliatory motive of the employer").

What is more, Defendants never explain what precisely about Article 8 they believe requires "interpretation." Plaintiff has not challenged Defendants' authority to alter break times. Nor have Defendants identified a single ambiguity in Article 8 that would require construing its terms. It is well-settled that "when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas*, 512 U.S. at 124. Yet this is precisely what Defendants attempt to accomplish. Their entire preemption argument rests on the notion that, at some later stage in this litigation, they may raise a defense that will "include [a] fact" about the CBA, namely their authority to alter employee break times. Defs.' Br. at 6. But in their effort to transform their future reliance on the CBA into a "core issue" of the Complaint, Defendants silently conflate factual *reference* to the CBA with the need for a legal *interpretation* of its terms—a distinction that courts have consistently recognized and enforced to confine § 301 preemption to its narrow scope. *See, e.g.*, *Voilas v. Gen. Motors Corp.*, 170 F.3d 367, 377 (3d Cir. 1999) (citing *Livadas*) ("[T]he fact that the parties' agreements may be referred to in the course of deciding this issue is of little moment to the preemption question before us."); 14C WRIGHT & MILLER'S FED. PRAC. & PROC. JURIS. § 3722.2 ("[T]he mere reference to a collective-bargaining agreement . . . is insufficient to assure complete preemption.").

In short, Defendants' preemption theory is nothing more than a misguided effort at jurisdictional bootstrapping. To justify the removal of this entire action, they take a passing factual allegation, inflate it into a standalone claim, and then attempt to disguise their own reference to the CBA as a jurisdictional trigger. To the extent any of Plaintiff's claims are premised on their suspension, in whole or in part, Defendants have not shown that any such claim is completely preempted by § 301.

### 2. *Suspension Allegation*

Defendants' second preemption theory fares no better. Paragraph 44 of the Complaint discloses that Plaintiff's April 2024 suspension was reduced to one day after it was disputed by their union. First, Defendants clarify that Plaintiff's suspension was challenged and ultimately reduced pursuant to the grievance procedures set forth in the CBA. *See* Defs.' Br. at 7. Asserting that they intend to rely heavily on those procedures in their future "defense of this action," they insist that "it is *impossible* to separate Plaintiff's claims of retaliation from the provisions of the CBA." *Id.* at 8 (emphasis in original). This pattern of reasoning is nearly identical to that underlying Defendants' first theory.

To the extent Plaintiff asserts any retaliation claim based on their suspension, such a claim would not be completely preempted. Again, the relevant inquiry is not whether Plaintiff's suspension was "appropriate," but whether it was imposed with retaliatory intent—an inquiry which does not pivot on any term of the CBA. *See Hawaiian Airlines*, 512 U.S. at 266 (rejecting contention that state-law retaliation claim required a determination whether discharge was "justified" under collective-bargaining agreement); *see also Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (noting that question of employer's intent does not turn on whether the employer was "wise, shrewd, prudent, or competent"); *Ishage v. PNC Bank Corp.*, No. A-1111-14T2, 2016 WL 456501, at *2 (N.J. Super. Ct. App. Div. Feb. 8, 2016) (citing *Fuentes*) ("[T]he issue is not whether the decision was unfair, but only whether it was motivated by retaliatory animus."). Likewise, Defendants do not identify an ambiguous provision in the CBA, much less explain precisely how Plaintiff's claims require a court to construe it. While they may envision referring to the CBA at a later stage in this litigation, that does not require a court, and certainly not a jury, to interpret its terms. *See Livadas*, 512 U.S. at 124.

In conclusion, Defendants have failed to carry their burden of demonstrating federal jurisdiction over this case. Both of their preemption theories seek to introduce facts not evinced on the face of the Complaint and attempt to spin Plaintiff's claims on nonexistent federal questions.[2] In doing so, Defendants inflate their own hypothetical references to the CBA into purported questions of contract interpretation, substitute their own notions of contractual propriety for the actual elements of retaliation, and ignore decades of binding precedent along the way. That these arguments are based on future, fact-based defenses only underscores the impropriety of removal:

> [T]he presence of a federal question, even a § 301 question, in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule—that the plaintiff is the master of the complaint, that a federal question must appear on the face of the complaint, and that the plaintiff may, by eschewing claims based on federal law, choose to have the cause heard in state court. When a plaintiff invokes a right created by a collective-bargaining agreement, the plaintiff has chosen to plead what we have held must be regarded as a federal claim, and removal is at the defendant's option. But a *defendant* cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated. If a defendant could do so, the plaintiff would be master of nothing. Congress has long since decided that federal defenses do not provide a basis for removal.

*Caterpillar*, 482 U.S. at 398–99 (emphasis in original).

This case was improperly removed and must be remanded to state court. As such, Plaintiff's motion is granted.

---

[2] The Court acknowledges that Defendants have separately cited to the "artful pleading" doctrine as another basis to justify removal. Under the artful pleading doctrine, "a court will not allow a plaintiff to deny a defendant a federal forum when the plaintiff's complaint contains a federal claim 'artfully pled' as a state law claim." *United Jersey Banks v. Parell*, 783 F.2d 360, 367 (3d Cir. 1986) (quoting 14A WRIGHT & MILLER'S FED. PRAC. & PROC. JURIS. § 3722 (1985)). But § 301 preemption is itself just a "species of the artful pleading doctrine," and Defendants' arguments on this point are therefore largely duplicative. 14C WRIGHT & MILLER'S FED. PRAC. & PROC. JURIS. § 3722.1 (Rev. 4th ed. 2025). Regardless, the artful-pleading doctrine clearly does not apply to here.

B. **Attorneys' Fees & Costs**

Plaintiff has also requested an award of costs and attorneys' fees. When remanding cases to state court, the removal statute authorizes district courts, in their discretion, to "require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). However, "absent unusual circumstances," such costs and fees "should not be awarded when the removing party has an objectively reasonable basis for removal." *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 136 (2005).

This case presents a close call. On the one hand, complete preemption is a complex and often misunderstood doctrine, and courts have generally been forgiving where removal is premised on an honest but mistaken view of its scope. *See, e.g.*, *Krasucki v. Am. Mar. Servs. of New York Inc.*, No. 23-03268, 2024 WL 2327985, at *9 (D.N.J. Apr. 25, 2024), *report and recommendation adopted*, 2024 WL 2318773 (D.N.J. May 20, 2024); *Sealy v. Verizon Commc'ns, Inc.*, No. 13-CV-7461, 2014 WL 7182341, at *4 n.3 (D.N.J. Aug. 1, 2014), *report and recommendation adopted*, 2014 WL 7331950 (D.N.J. Dec. 15, 2014). On the other hand, the doctrine's complexity does not excuse removing parties from acknowledging or grappling with binding precedent—particularly where such precedent squarely forecloses the arguments advanced. Nor does it absolve counsel of their obligation to thoroughly familiarize themselves with the law prior to removing a case to federal court.[3]

Here, rather than engage directly with the governing law or otherwise argue within its established boundaries, Defendants largely ignored it, electing instead to rely on misstatements of

---

[3] The Court was particularly struck by the disconnect between Defendants' Notice of Removal and their opposition to Plaintiff's motion. For example, among the authorities cited by Defendants' Notice to directly support removal was *Lingle*—a case which, as explained above, actually foreclosed the very basis for removal Defendants envisioned. *See* Notice of Removal ¶¶ 7, 9–10. Curiously, Defendants' opposition makes no mention of *Lingle*, even though it was repeatedly cited in their Notice and squarely raised in Plaintiff's motion. *See* Pl.'s Br. at 5. That omission is telling, and it seems to suggest that Defendants did not adequately familiarize themselves with the law prior to invoking federal jurisdiction.

law and misleading rhetoric to create the illusion of a federal question. Nevertheless, having undertaken an exceptionally thorough examination of Defendants' submissions, the Court has reason to believe that *some* aspects of their rationale stemmed from discrete and genuine misapprehensions of complete preemption. While the Court finds that those specific misapprehensions are sufficiently reasonable to stave off an award of costs and fees in this instance, counsel—and others in similar positions—are cautioned that future removals predicated on comparably mistaken or superficial grounds may not receive the same indulgence.

## VI.   CONCLUSION

Because Plaintiff's claims are not completely preempted by the LMRA, no federal question appears on the face of the Complaint. Observing no other basis for federal subject-matter jurisdiction, the Court grants Plaintiff's motion and remands this matter accordingly to the Superior Court of New Jersey, Law Division, Atlantic County, without costs or fees.

An appropriate Order accompanies this Opinion.

Date:   August 29, 2025

KAREN M. WILLIAMS
U.S. DISTRICT COURT JUDGE